UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

AMANDA M. REICH, ET AL.                                    Plaintiffs

v.                                    Civil Action No. 3:16-cv-00429-RGJ

CITY OF ELIZABETHTOWN, ET AL.                             Defendants

* * * * *

## MEMORANDUM OPINION AND ORDER

Plaintiffs, Elise Davidson, successor administratrix for Joshua Blough's estate, and Amanda Reich (collectively, "Plaintiffs"), bring this action against the City of Elizabethtown ("City"), Officer Scot Richardson, and Officer Matthew McMillen (collectively, "Defendants") alleging that the City and its officers violated the Fourth and Eighth Amendments to the United States Constitution when the officers shot and killed Joshua Blough on July 7, 2015. [DE 35, Amend. Compl. at 217]. Plaintiffs also bring related state-law tort claims. Discovery has concluded, and Defendants now move for summary judgment under Federal Rule of Civil Procedure 56. [DE 55, MSJ]. A timely response [DE 61] and reply [DE 68] were filed. Oral argument was held on October 30, 2018. [DE 76]. This matter is ripe for adjudication. Having considered the parties' filings and the applicable law, the Court **GRANTS** Defendants' Motion for Summary Judgment.

## BACKGROUND

### A.      Factual Background

On July 6, 2015, Steven Blough went to a Communicare mental health facility in Leitchfield, Kentucky. [DE 61, Resp. MSJ at 1707]. While being assessed for potential treatment, Blough—who suffered from chronic schizophrenia, paranoia, depression, bipolar disorder, and

was a chronic methamphetamine and benzodiazepine user—reported that he had not taken his medication for four months and had attempted suicide three times, including once in the prior five days. [DE 55-7, Comm. Record]. He had previously been hospitalized for his mental health conditions and drug abuse. [DE 55-6, KYIBRS Rep.]. The Communicare counselor recommended immediate admission. [DE 55-7, Comm. Record]. Blough declined, but agreed to return for admission and treatment the next day. *Id*. Before departing, Blough signed a document agreeing that he would not try to commit suicide or harm himself or others before checking into a facility. *Id.*

The next day, Blough and his fiancé, Amanda Reich, began traveling from Leitchfield to a Communicare facility in Elizabethtown. [DE 61 at 1708]. While stopped at a traffic light, Blough saw a Kentucky State Police ("KSP") vehicle stopped on the side of the Western Kentucky Parkway near White Mills. [DE 55 at 503]. Blough, high on methamphetamine, became "really upset," hallucinated that the KSP were after him, and said that "there were police officers everywhere." [DE 55-5, Reich Depo. at 606].

Later, Blough and Reich stopped at another traffic light on Highway 62 in Elizabethtown. *Id.* at 607–08. Blough was still hallucinating and, referring to the police, said to Reich, "I'm not gonna let anybody hurt you, but I'm not gonna let anybody hurt me either." *Id.* at 608. Blough, armed with an open and locked three-inch knife, exited the vehicle. *Id.* After a brief moment, Reich successfully talked him into reentering the vehicle, and they drove on. *Id.*

Still armed with the blade open and locked, Blough again exited the vehicle at the intersection of Ring Road and Patriot Parkway in Elizabethtown. *Id.* at 609. Reich said that "it was like when [Blough] was walking he wasn't even acknowledging any cars coming by or

nothing." *Id.* She pleaded with Blough to reenter the vehicle, but he refused and left the intersection on foot. *Id.*

Reich felt that "she couldn't contain the situation" and immediately called 911. [DE 55-9, Richardson Depo. at 693]. She told the dispatcher that she "was afraid that somebody else would get the wrong idea and call in thinking that [Blough] was a threat to someone and that he would end up getting shot." [DE 55-8, First 911 Transc. at 681]. She said that Blough had "schizophrenia and stuff," had "not had his medicine," and thought everybody was "out to get him." *Id.*

In response to Reich's 911 call, Hardin County Dispatch connected Reich to Officer Matthew McMillen, and they spoke on the phone. [DE 55-5, Reich Depo. at 610]. Officer McMillen then arrived at the scene to do a welfare check, where Reich said that Blough was off his medication, paranoid, and disliked police. [DE 55-6, KYIBRS Rep.]. Reich told Officer McMillen that she wanted to get Blough to reenter the vehicle without police involvement. [DE 55-5, Reich Depo. at 621]. Officer McMillen told her that if Blough "is in that paranoid state and he sees an officer, you know, he could perceive us as a threat and act upon it, especially if he's armed with a knife." [DE 61-7, McMillen Statem. at 2192–95]. Reich told Officer McMillen that Blough had not threatened anyone, and Officer McMillen agreed to follow Reich's plan. *Id.* Officer McMillen returned to his vehicle and advised dispatch of the situation. *Id.*

In the meantime, Blough had entered a residential subdivision near Fontaine Drive. He had removed his shirt and was sweating profusely. [DE 55-5, Reich Depo. at 608]. Reich thought Blough seemed "agitated and upset." *Id.* at 621. Nearby residents reported that Blough was wandering onto local properties and attempting to enter residences. First, Helen Howlett said that she saw "a suspicious-looking" man "wandering up-and-down the street into my yard and the yards of my neighbors." [DE 55-11, Howlett Aff. at 823]. Second, Madison Pils said that she "was

walking home and saw a strange guy walking a little bit of the way down the street..." [DE 55-12, Pils Statem. at 825]. Third, Randal Ray said that, in response to Blough's behavior, Ray "became concerned and locked [his truck], closed the garage door, and went into [his] house to get his pistol." [DE 55-13, Ray Aff. at 826]. Finally, David Mills said that he "saw a man on the patio of [his] brother's house and it looked like he was trying to get into [the] back door." [DE 55-14, D. Mills Aff. at 828]. Later, Mills said that he "saw a man standing in [his] front yard" with a knife in his hand. *Id.* Mills told Reich that he would call 911 because "there were people and kids in the neighborhood." *Id.* The 911 Call Center received calls from drivers passing the subdivision, one of whom said that Blough had "a knife in his hand like he's going to stab somebody or someone." [DE 55-15, Second 911 Transc. at 830].

Across from the subdivision, Severns Valley Baptist Church was hosting a camp for about 200 children. [DE 55-16, Wilson Aff. at 837]. Reich had parked "right by Severns Valley" [DE 55-8, 911 Transcript at 681–82], and the children were recreating and playing on the lawn adjacent to Blough's location. [DE 55-16, Wilson Aff. at 837]. The Church's Executive Pastor said that Severns Valley went on "lock down" and notified parents that the children were unharmed. *Id.*

Reich entered the subdivision and asked Blough to put the knife down and reenter the vehicle. [DE 55-5, Reich Depo. at 611]. Blough refused, and Reich testified that Blough "must have seen the police—the police talking to [her] so [Blough] thought [she] was involved in trying to get him hurt too, you know." *Id.* at 611–12. Officer Scot Richardson was nearby and reported seeing Blough in the neighborhood, describing Blough's behavior as "bizarre." [DE 55-9, Richardson Depo. at 697]. Officer McMillen returned and spoke with Reich while Officer Richardson arrived separately in a marked vehicle. [DE 55-10, McMillen Depo. at 764]. Officer McMillen described Blough's presence in the residential neighborhood as adding "another

4

dynamic." *Id.* at 784. Similarly, Officer Richardson said that "the situation changed from an enclosed vehicle to running across the major roadway, to entering a field, to the situation changed from 'he's probably going to be okay in a field' setting, to now he's in the neighborhood with a knife and there's residents that live in that neighborhood." [DE 55-9, Richardson Depo. at 705].

With Officers Richardson and McMillen now present, Reich again asked the officers not to approach Blough until she tried to make him drop the knife. [DE 55-5, Reich Depo. at 613]. The officers agreed, and Reich approached Blough in a resident's front yard. *Id.* Blough still refused to drop the knife or enter the vehicle. *Id.* As Reich continued to ask Blough to drop the knife [DE 53, Reich Interview], Blough moved toward Officer Richardson at a "very fast pace." [DE 55-9, Richardson Depo. at 700–02]. He looked at Officer Richardson with the knife blade in a stabbing position. *Id.* at 700; [DE 55-10, McMillen Depo. at 768]. Blough stopped, touched Reich, and told her to "get the fu** back." [DE 55-9, Richardson Depo. at 704].

Officer Richardson perceived Blough as a threat to himself, Reich, and other persons in the neighborhood, and commanded Blough to drop the knife. *Id.* at 709, 715. Blough refused.[1] [DE 55-5, Reich Depo. at 617]. Officer Richardson had his pistol raised to the "on target" position.[2]

---

[1] The parties agree that Blough was intoxicated on methamphetamine during this interaction. [DE 55 at 509; DE 61 at 1715]. Officer Richardson said Blough's actions were consistent with methamphetamine-induced behavior. [DE 55-9, Richardson Depo. at 714]. Officer McMillen described such individuals as "unpredictable." [DE 55-10, McMillen Depo. at 787]. Plaintiffs also attribute Blough's refusal to follow the officers' commands to his intoxication. [DE 61 at 1715]. Officers Richardson and McMillen testified that they attempted to de-escalate the situation by not activating their police lights or sirens, not calling for more units to the scene, not crowding Blough, and giving repeated commands for Blough to stop and drop his weapon. [DE 55-9, Richardson Depo. at 714–15; DE 55-10, McMillen Depo. at 761, 786–788]. They testified that they employed other techniques as well, but Defendants dispute that the officers employed those other techniques.

[2] The parties disagree about when Officers Richardson and McMillen first drew their weapons. Plaintiffs claim that the officers had their weapons drawn while Reich spoke to Blough in the subdivision. [DE 55-5, Reich Depo. at 619]. But Defendants claims that the officers did not fully draw their weapons until moments before the shooting. [DE 55-9, Richardson Depo. at 704].

*Id.* at 614.  Still looking at Officer Richardson, Blough said, "you're going to have to kill me motherf**ker." *Id.* at 615.

Blough stepped either toward or away from Officer Richardson.[3]  Officer Richardson fired two shots in rapid succession, each striking Blough.  [DE 55-9, Richardson Depo. at 693].  Blough said "you shot me" and fell face down in the grass.  [DE 55-5, Reich Depo. at 617].  Officer McMillen also fired his weapon but missed Blough.  [DE 55-10, McMillen Depo. at 776–77].  Officers Richardson and McMillen administered first aid, but Blough died shortly thereafter on the way to Hardin Memorial Hospital.  *Id.* at 777.

## B.    Procedural Background

Reich and Jamie Nelson, as Personal Representative of Blough's Estate, filed this action alleging Fourth and Eighth Amendment violations under 42 U.S.C. § 1983, as well as state law tort claims for negligence; battery; negligent hiring, training, and supervision; negligent infliction of emotional distress; and outrage, also known as intentional infliction of emotional distress.  [DE 35 at 222–26].  Plaintiffs then filed a Motion to substitute Elise Davidson for Jamie Nelson as Personal Representative of Blough's Estate [DE 22], which the Court granted [DE 30].  Later, the Court granted an Agreed Order of Partial Dismissal for all claims against Tracy Shiller, Chief of the Elizabethtown Police Department.  [DE 38].

Discovery concluded on February 1, 2018, and Defendants now move for summary judgment under Federal Rule of Civil Procedure 56.  [DE 55].  Plaintiffs filed a Response that

---

[3] There is disagreement about whether Blough continued to step toward Officer Richardson or turned in the other direction the moment before he was shot.  Officer Richardson and three independent eye witnesses testified that Blough continued toward Officer Richardson with the knife in a stabbing position.  [DE 55-9, Richardson Depo. at 714; DE 55-11, Howlett Aff. at 823; DE 55-14, D. Mills Aff. at 829; DE 55-17, H. Mills Statement at 839].  But one of those same witnesses, Helen Howlett, initially wrote a statement for KSP claiming that Blough was trying to get away from the officers when he was shot.  [DE 61-10, Howlett KSP Stat. at 2262].  Reich also testified that Blough took "one or two steps" away from the police.  [DE 55-5, Reich Depo. at 615].

includes an affidavit attested to by Reich. [DE 61]. The affidavit includes new assertions that Defendants claim contradict Reich's earlier deposition testimony, and Defendants argue in their Reply that the Court should therefore disregard the affidavit. [DE 68, Reply MSJ at 3915]. Oral argument on the Motion for Summary Judgment was held on October 30, 2018. [DE 76].

## LEGAL STANDARD

Summary judgment is required when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of specifying the basis for its motion and demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the moving party satisfies this burden, the nonmoving party must produce specific facts demonstrating a material issue of fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). "Factual differences are not considered material unless the differences are such that a reasonable jury could find for the party contesting the summary judgment motion." *Bell v. City of E. Cleveland*, 125 F.3d 855 (6th Cir. 1997) (citing *Liberty Lobby*, 477 U.S. at 252).

A district court considering a motion for summary judgment may not weigh evidence or make credibility determinations. *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 702 (6th Cir. 2008); *Adams v. Metiva*, 31 F.3d 375, 379 (6th Cir. 1994). The Court must view the evidence and draw all reasonable inferences in a light most favorable to the nonmoving party. *Williams v. Int'l Paper Co.*, 227 F.3d 706, 710 (6th Cir. 2000). But the nonmoving party must do more than show some "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also Loyd v. Saint Joseph Mercy Oakland*, 766 F.3d 580, 588 (6th Cir. 2014). Instead, the nonmoving party must present specific facts showing that a genuine factual issue exists by "citing to particular parts of materials in the record" or by "showing

that the materials cited do not establish the absence… of a genuine dispute[.]" *Shreve v. Franklin Cty., Ohio*, 743 F.3d 126, 136 (6th Cir. 2014). "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Liberty Lobby*, 477 U.S. at 252.

## DISCUSSION

**A.**     **Reich's Affidavit Filed in Response to Defendants' Motion for Summary Judgment**

First, the Court must decide whether it is proper to accept Reich's new affidavit filed as part of Plaintiffs' Response to Defendants' Motion for Summary Judgment. [DE 61-15, Reich Aff.]. Defendants argue in their Reply that the Court should disregard the affidavit because it includes new assertions that Defendants claim contradict Reich's earlier deposition testimony. [DE 68, Reply MSJ at 3915].

Generally, "[a] party cannot create a factual dispute by filing an affidavit, after a motion for summary judgment has been made, which contradicts earlier testimony." *Dotson v. U.S. Postal Serv.*, 977 F.2d 976, 978 (6th Cir. 1992) (*per curiam*) (citing *Gagne v. Nw. Nat. Ins. Co.*, 881 F.2d 309, 315 (6th Cir. 1989)); *see also Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir. 1986); *Biechele v. Cedar Point, Inc.*, 747 F.2d 209, 215 (6th Cir. 1984). "If a witness, who has knowledge of a fact, is questioned during her deposition about that fact, she is required to 'bring it out at the deposition and [cannot] contradict her testimony in a subsequent affidavit.'" *Holt v. Olmsted Township Bd. of Trs.*, 43 F. Supp. 2d 812, 817 (N.D. Ohio 1998) (quoting *Reid*, 790 F.2d at 460). Put differently, "a party cannot avoid summary judgment through the introduction of self-serving affidavits that contradict prior sworn testimony." *U.S. ex rel. Compton v. Midwest Specialties, Inc.*, 142 F.3d 296, 303 (6th Cir. 1998). Numerous courts have declared that self-serving affidavits without factual support in the record will not defeat a motion for summary

judgment.  *See, e.g., Devine v. Jefferson Cnty., Kentucky*, 186 F. Supp. 2d 742, 744 (W.D. Ky. 2001); *Jadco Enterprises, Inc. v. Fannon*, 991 F. Supp. 2d 947, 955 (E.D. Ky. 2014); *Syvongxay v. Henderson*, 147 F. Supp. 2d 854, 859 (N.D. Ohio 2001); *Wolfe v. Village of Brice*, 37 F. Supp. 2d 1021, 1026 (S.D. Ohio 1999) ("Self-serving affidavits, alone, are not enough to create an issue of fact sufficient to survive summary judgment.") (citing *Liberty Lobby*, 477 U.S. at 251; *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995)).  Such affidavits fail to create an issue of material fact.  *Lanier v. Bryant*, 332 F.3d 999, 1004 (6th Cir. 2003).  The affidavit need not explicitly contradict prior testimony for the Court to disregard it; it must only interject factual assertions not disclosed during discovery.  *Myers v. Huron Cty., Ohio*, No. 3:06-CV-3117, 2008 WL 271657, at *2 (N.D. Ohio Jan. 31, 2008), *aff'd*, 307 F. App'x 917 (6th Cir. 2009).

When asked at her deposition to describe the positions of Blough and the officers during the shooting, Reich testified that she was "not sure" and did not "want to guess about it."  [DE 55-5, Reich Depo. at 614].  But nearly two years after the shooting and explicitly in response to Defendants' Motion for Summary Judgment, Reich and her attorneys attempted to recreate the scene in detail.  [DE 61-15, Reich Aff. at 2565].  The affidavit includes measurements, photographs, and notes that position the parties based on Reich's current recollection of the events. *Id.*  Among other things, the affidavit places the distance between Blough and Officer Richardson at greater than 25 feet—nearly double the distance that other witnesses testified to shortly after the shooting.  [DE 61-15, Reich Aff. at 2567].  There is no other support in the record for this factual assertion.

Defendants argue that the Court should exclude this new testimony on several grounds. First, they claim that there is no newly-discovered evidence or compelling reason that merits the testimony's consideration.  [DE 68 at 3905].  Second, they note that this information was not

produced to Defendants prior to the close of discovery, that all expert discovery is now closed, and all liability experts have been deposed. *Id.* Defendants argue that they therefore have no opportunity to cross-examine Reich about these new assertions. *Id.* Finally, Defendants question the timing of the affidavit, labeling it "suspicious and self-serving." *Id.* at 3904, n. 1.

Reich previously testified that she did not know the distance between Blough and Officer Richardson during the shooting, and Plaintiffs fail to explain why they waited until after the close of discovery to attempt to recreate the scene. This is improper. *See Powell-Pickett v. A.K. Steel Corp.*, 549 F. App'x 347, 353 (6th Cir. 2013) ("Because [the plaintiff] was asked specific questions about, yet denied knowledge of, the material aspects of her case, the material allegations in her affidavit directly contradict her deposition."); *White v. Baptist Mem'l Health Care Corp.*, 699 F.3d 869, 877 (6th Cir. 2012) (noting the rule is that a party opposing summary judgment with an affidavit that contradicts her earlier deposition must explain why she disagrees with herself). Plaintiffs had access to the same factual record as Defendants. If Reich remembered the distance between the parties after her deposition and after reading others' testimony, she was required to make this assertion before discovery closed and to update her prior testimony. *See* Fed. R. Civ. P. 37; *Myers*, No. 3:06-CV-3117, 2008 WL 271657, at *2. Instead, she waited until after discovery closed and responded to Defendants' Motion with an affidavit that aims to create a factual issue for trial. *Powell-Pickett*, 549 F. App'x at 353 ("A party may neither duck her deposition, nor hold her cards in anticipation of later advantage.") "If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." *Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir.

1986) (citation omitted). Accordingly, the Court declines to consider these new contradictory assertions in ruling on the Motion for Summary Judgment.[4]

## B. Section 1983 Claims

Plaintiffs allege that Defendants' conduct constituted unnecessary and unwarranted lethal force in violation of the Fourth and Eighth Amendments, entitling them to damages under 42 U.S.C. § 1983. [DE 35 at 222]. "[Section] 1983 is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." *Graham v. Connor*, 490 U.S. 386, 393–94 (1989) (internal quotation omitted). To state a claim under Section 1983, "a plaintiff must set forth facts that, when construed favorably, establish (1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law." *Burley v. Gagacki*, 729 F.3d 610, 619 (6th Cir. 2013).

Defendants maintain that Blough was not deprived of a constitutional right and assert the affirmative defense of qualified immunity. "Qualified immunity protects government officials performing discretionary functions unless their conduct violates a clearly established statutory or constitutional right of which a reasonable person in the official's position would have known." *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006). It "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v.*

---

[4] Even if the Court accepted Reich's affidavit, her assertions about the distance of the parties would not change the Court's ruling. Reich puts the distance between Blough and Officer Richardson at 25 feet 6 inches—more than double the estimates made by third-party witnesses shortly after the shooting. [DE 61 at 16–17]. Even so, the officers could still reasonably believe that Blough was a danger to themselves and other parties on the scene, including the 200 day-camp children at nearby Severns Valley Baptist Church, concerned residents watching the scene, and Reich herself. The Sixth Circuit has never required a particular distance between a weapon-wielding man and potential victims for an officer to reasonably believe that people are in serious physical danger. *Stevens-Rucker v. City of Columbus, OH*, 739 F. App'x 834, 842–43 (6th Cir. 2018) (finding that an officer behaved reasonably when he shot a fleeing suspect armed with a knife from twenty-five feet away). As discussed later, the relevant fact-intensive inquiry is whether, *considering the totality of the circumstances*, a reasonable officer would consider the man a serious physical threat. *Chappell v. City of Cleveland*, 585 F.3d 901, 911 (6th Cir. 2009). While the distance between the parties is relevant to this inquiry, it is not dispositive in this case.

*Briggs*, 475 U.S. 335, 341 (1986). Thus, law enforcement's conduct is not actionable if they are exercising discretion and their determinations are reasonable. *Jeffers v. Heavrin*, 10 F.3d 380, 381 (6th Cir. 1993).

When advanced by a defendant, qualified immunity is a threshold question of law appropriately determined on a motion for summary judgment. *Harlow v. Fitzgerald*, 457 U.S. 800 (1983). "Because qualified immunity is 'an immunity from suit rather than a mere defense to liability… it is effectively lost if a case is erroneously permitted to go to trial.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). Once a defendant raises the defense, the plaintiff bears the burden of showing that it does not apply. *Johnson v Moseley*, 790 F.3d 649 (6th Cir. 2015).

The Supreme Court requires courts to follow a two-pronged approach when resolving questions of qualified immunity. First, a court must decide whether a plaintiff has presented sufficient facts that violation of a constitutional right has occurred. *Pearson*, 555 U.S. at 232. Second, a court must decide whether the right at issue was "clearly established" at the time of the alleged misconduct. *Id.* Thus, qualified immunity applies unless the official's conduct violates a clearly established constitutional right. *Id.* (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Courts have discretion to decide the order in which to engage these two prongs "in light of the circumstances in the particular case at hand." *Id.* at 236.

### 1. Violation of a Constitutional Right

#### a. Fourth Amendment

First, Plaintiffs allege that Defendants violated Blough's Fourth Amendment rights because Officers Richardson and McMillen deployed excessive force in seizing Blough. [DE 35 at 217]. The Supreme Court has held that claims brought under Section 1983 involving law

enforcement's use of deadly force are properly analyzed under the Fourth Amendment, which guarantees citizens the right to be secure in their persons against unreasonable seizures. *Graham*, 490 U.S. at 394. The "reasonableness" of a particular seizure depends on both when it is made and how it is carried out. *Id.* at 395 (citing *Tennessee v. Garner*, 471 U.S. 1, 7–8 (1985)). It is clear that "[t]he intrusiveness of a seizure by means of deadly force is unmatched." *Garner*, 471 U.S. at 9. "Therefore, only in rare instances may an officer seize a suspect by use of deadly force." *Whitlow v. City of Louisville*, 39 F. App'x 297, 303 (6th Cir. 2002) (citing *Garner*, 471 U.S. at 9).

The Fourth Amendment's reasonableness test "is not capable of precise definition or mechanical application." *Bell v. Wolfish*, 441 U.S. 520, 559 (1979). Thus, its application requires careful attention to the facts and circumstances of each case, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.; see also Smith v. Freland*, 954 F.2d 343, 347 (6th Cir. 1992) (noting that courts "must avoid substituting [their] personal notions of proper police procedure for the instantaneous decision of the officer at the scene… [and] never allow the theoretical, sanitized world of their imagination to replace the dangerous and complex world that policemen face every day.").

When analyzing excessive force claims, the Sixth Circuit has adopted the view of doing so in segments. *Dickerson v. McClellan*, 101 F.3d 1151, 1161 (6th Cir. 1996) (holding that review of excessive force claims should be limited to officers' actions in the moments preceding the shooting). This "somewhat narrow interpretation of the Supreme Court's mandate that courts look to the totality of the circumstances in determining if excessive force was used," *Claybrook v.*

*Birchwell*, 274 F.3d 1098, 1103 (6th Cir. 2001), is "long-standing practice" in the Sixth Circuit, even though it may lead to more excessive force cases being decided on summary judgment. *Rucinski v. Cty. of Oakland*, 655 F. App'x 338, 342 (6th Cir. 2016).

In this case, then, the relevant inquiry is whether Officers Richardson and McMillen acted reasonably during the final encounter with Blough on the resident's front yard. The undisputed facts show that during the final encounter, Reich approached Blough in the front yard and asked him to put down the knife and enter her vehicle. [DE 55-5, Reich Depo. at 613]. Blough refused and moved toward Officer Richardson at a fast pace. [DE 55-9, Richardson Depo. at 700–02]. Blough looked at Officer Richardson with the knife in a stabbing position, stopped, touched Reich, and told her to "get the fu** back." *Id.* at 700, 704; [DE 55-10, McMillen Depo. at 768]. Officer Richardson told Blough to drop the knife. [DE 55-5, Reich Depo. at 617]. Blough refused and said, "you're going to have to kill me motherf**ker." *Id.* at 615. Officers Richardson and McMillen then fired at Blough, with two of Officer Richardson's bullets striking and eventually killing Blough. [DE 55-9, Richardson Depo. at 693; DE 55-10, McMillen Depo. at 776–77].

Analyzing these facts under the *Graham* factors, Officers Richardson and McMillen behaved reasonably during the encounter. First, Blough's crimes were serious. He was wandering around the subdivision, acting erratic, standing on a resident's yard armed with a knife, alarming nearby residents, and ignoring Officer Richardson's commands to drop the knife. [DE 55-9, Richardson Depo. at 693]. Second, Blough presented an urgent and realistic threat to both Reich and the officers. He responded to Reich's pleas by touching her and telling her to "get the fu** back." And when commanded by Officer Richardson to drop the knife, Blough strode toward the officer and said that Officer Richardson would have to kill him. Both officers could reasonably perceive this behavior as a threat to themselves and Reich. Finally, Blough was clearly resisting

arrest—or, at a minimum, resisting Officer Richardson's command to drop the knife. Thus, the totality of the circumstances justified the officers' seizure of Blough, and the officers' response was reasonable under the circumstances. *Goodwin v. City of Painesville*, 781 F.3d 314, 321 (6th Cir. 2015) ("Ultimately, the court must determine whether the totality of the circumstances justifies a particular sort of seizure.") (citation omitted).

Further, Plaintiffs' argument that Defendants should have taken greater care due to Blough's mental illnesses is without merit. In *Rucinski*, the plaintiff was bipolar, schizophrenic, and paranoid. 655 F. App'x at 339. When his girlfriend refused to get him cigarettes, the plaintiff yelled, pulled a knife from his pocket, and opened the blade. *Id.* His girlfriend called 911 and warned the dispatch operator that the plaintiff was "schizophrenic and was having a breakdown," had a knife, and was alone in the garage. *Id.* Three deputies arrived to do a welfare check. When one of the officers engaged the plaintiff, the plaintiff again pulled out and opened his knife, said "bring it on" or "here we go," and began walking toward the officer. *Id.* The plaintiff refused to comply with repeated commands to drop the weapon, so one officer fired her taser while the other discharged her pistol, striking and killing the plaintiff. *Id.* The Sixth Circuit held that the plaintiff's mental illness had no bearing on whether the officers behaved reasonably, noting that the plaintiff identified "no case law restricting an officer's ability to use deadly force when she has probable cause to believe that a mentally ill person poses an imminent threat of serious physical harm to her person." *Id.* at 342 (citing *Sanders v. City of Minneapolis*, 474 F.3d 523, 527 (8th Cir. 2007); *Bates ex rel. Johns v. Chesterfield County, Va.*, 216 F.3d 367, 372 (4th Cir. 2000)).

Here, as in *Rucinski*, Blough had a long history of mental health issues. He suffered from chronic schizophrenia, paranoia, depression, and bipolar disorder. [DE 55-7, Comm. Record]. He was also a chronic methamphetamine and benzodiazepine user. *Id.* He had reported three previous

suicide attempts, including one attempt five days prior to the shooting. *Id.* But, like in *Rucinski*, Blough can point to no case law restricting an officer's use of force when a mentally ill person poses an imminent threat. *Rucinski* makes clear that the relevant inquiry is whether a person poses a threat to law enforcement, not whether that person is mentally ill. Other circuits have held similarly. *See Sanders v. City of Minneapolis, Minnesota*, 474 F.3d 523, 527 (8th Cir. 2007) ("The fact that [the decedent] may have been experiencing a bipolar episode does not change the fact that he posed a deadly threat against the police officers."); *Bates ex rel. Johns v. Chesterfield Cty., Va.*, 216 F.3d 367, 372 (4th Cir. 2000) ("Knowledge of a person's disability simply cannot foreclose officers from protecting themselves, the disabled person, and the general public when faced with threatening conduct by the disabled individual."); *Menuel v. City of Atlanta*, 25 F.3d 990, 996 (11th Cir. 1994) (upholding use of deadly force to apprehend a mentally ill man who had a knife and was hiding behind a door). Thus, Blough's mental illness had no bearing on whether the officers behaved reasonably and is irrelevant to Plaintiffs' Fourth Amendment claim.

Next, Plaintiffs argue that the *Graham* factors do not apply because Blough had not committed a crime. [DE 61 at 1707, 1717]. This is incorrect. As Defendants point out, Blough's actions at a minimum amount to disorderly conduct and wanton endangerment, among other crimes. [DE 68 at 3915]. The record also shows that Blough was, at a minimum, trespassing on residents' properties and resisting arrest.

But even if the *Graham* three-factor test did not apply, Plaintiffs still fail to rebut the defense of qualified immunity under the standard announced in *Estate of Hill by Hill v. Miracle*, 853 F.3d 306, 314 (6th Cir. 2017). In that case, the court developed "a more tailored set of factors [to] be considered in the medical-emergency context, always aimed towards the ultimate goal of determining 'whether the officers' actions are objectively reasonable in light of the facts and

circumstances confronting them.'" *Id.* (quoting *Graham*, 490 U.S. at 397). "Where a situation does not fit within the *Graham* test because the person in question has not committed a crime, is not resisting arrest, and is not directly threatening the officer, the court should ask:

> (1) Was the person experiencing a medical emergency that rendered him incapable of making a rational decision under circumstances that posed an immediate threat of serious harm to himself or others?
>
> (2) Was some degree of force reasonably necessary to ameliorate the immediate threat?
>
> (3) Was the force used more than reasonably necessary under the circumstances (i.e., was it excessive)?

If the answers to the first two questions are 'yes,' and the answer to the third question is 'no,' then the officer is entitled to qualified immunity." *Id.*

Here, then, even if Plaintiffs are correct that Blough was not committing a crime and was experiencing a mental-health emergency that rendered him incapable of acting rationally under the circumstances, they would still need to show that force was not reasonably necessary to address the threat or that the force actually used was more than reasonably necessary. They fail to do so.

First, Blough posed an immediate threat of serious harm to the officers and the community. He was wandering around a residential community with a knife in his dominant hand and attempting to enter private residences. Community residents felt threatened by his erratic behavior. [*See* DE 55-11, Howlett Aff. at 823; DE 55-12, Pils Statem. at 825; DE 55-13, Ray Aff. at 826; DE 55-14, D. Mills Aff. at 828]. Second, some force was reasonably necessary to ameliorate that threat because Blough refused to drop the knife, submit to police, or reenter Reich's vehicle. Finally, for the reasons described above, Officers Richardson's and McMillen's use of deadly force was not more than reasonably necessary under the circumstances. Thus, even under the test

espoused in *Estate of Hill by Hill v. Miracle*, Plaintiffs fail to show a violation of Blough's Fourth Amendment rights.

### b. Eighth Amendment

Next, Plaintiffs allege that Defendants' conduct violated the Eighth Amendment's prohibition on cruel and unusual punishment. [DE 35 at 222]. The Supreme Court has repeatedly held that the Eighth Amendment protects only convicted persons from excessive force. *See Whitley v. Albers*, 475 U.S. 312, 318 (1986); *Ingraham v. Wright*, 430 U.S. 651, 670 (1977); *City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 243 (1983); *Bell v. Wolfish*, 441 U.S. 520, 535 (1979); *see also Burgess v. Fischer*, 735 F.3d 462, 472 (6th Cir. 2013) ("The Fourth Amendment's prohibition against unreasonable seizures bars excessive force against free citizens… while the Eighth Amendment's ban on cruel and unusual punishment bars excessive force against convicted persons," and the Fourteenth Amendment's Due Process Clause applies when the citizen does not fall into either category) (internal citations omitted).

Plaintiffs have neither shown nor attempted to show that Blough was convicted of a crime at the time of the incident. To the contrary, they argue that Blough "had not committed and was not in the process of committing a crime at the time of the seizure." [DE 61 at 1729]. Further, Plaintiffs stated at the October 30, 2018 hearing that they no longer intend to pursue an Eighth Amendment claim. [DE 76, Oct. 30, 2018 Tr., 4008:16–20]. The Eighth Amendment claim is therefore moot.

### 2. Clearly Established Right

Even had Plaintiffs presented sufficient facts that Defendants violated Blough's rights, Plaintiffs still fail to show that the right at issue was "clearly established" at the time of the incident. As noted above, qualified immunity applies unless the official's conduct violates a clearly

established right. *Pearson*, 555 U.S. at 232. The law must be sufficiently clear that every "reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 563 U.S. 731 (2011) (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "In other words, existing precedent must have placed the statutory or constitutional question beyond debate." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (internal citation and quotation marks omitted). Specificity is particularly "important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Kisela v. Hughes*, 138 S.Ct. 1148, 1152 (2018) (*per curiam*) (internal citation and quotation marks omitted). And lower courts should not read prior decisions too broadly in deciding whether a new set of facts is governed by clearly established law. *Id.* at 1154 (citing *City & Cty. of San Francisco, Calif. v. Sheehan*, 135 S. Ct. 1765 (2015)). "The critical question is whether the case law has put the officer on notice that his conduct is clearly unlawful." *Reichle*, 566 U.S. at 664.

Here, there are no cases directly on point. However, similar cases fail to show that Defendants violated a clearly established right. In fact, those cases support Defendants' contention that they are entitled to qualified immunity. As discussed above, the court in *Rucinski* held that there was no violation when officers shot and killed a man armed with a knife when he walked toward the officers and said, "bring it on" or "here we go." 655 F. App'x at 339. Specifically, the court found that it was reasonable for the officers to believe that they and others were in danger, requiring a split-second decision. *Id.* at 341. It also noted that this decision was in line with prior Sixth Circuit precedent in similar cases. *See Chappell v. City of Cleveland*, 585 F.3d 901, 911 (6th Cir. 2009) (holding that, where detectives shot and killed a fifteen-year-old boy after he approached them with a knife over his head, the detectives' use of force was reasonable as a matter

of law); *Rhodes v. McDannel*, 945 F.2d 117, 118 (6th Cir. 1991) (holding that an officer acted reasonably as a matter of law when he shot and killed a suspect brandishing a knife after the suspect did not comply with commands to drop the knife).

As in *Rucinski*, *Chappell*, and *Rhodes*, the officers here were confronted with a person brandishing a knife. The officers reasonably perceived Blough as a threat and felt compelled to make a split-second decision. Even if Officers Richardson and McMillen were mistaken in their belief that Blough was a threat, Sixth Circuit law makes clear that "[q]ualified immunity applies irrespective of whether the official's error was a mistake of law or a mistake of fact, or a mistake based on mixed questions of law and fact." *Chappell*, 585 F.3d at 907 (citing *Pearson*, 555 U.S. at 231). Accordingly, it cannot be said that Officers Richardson and McMillen were put on notice that their conduct was unlawful or violated a clearly established right under Sixth Circuit law.

### 3. *Monell* Claim

Plaintiffs assert that the City is liable for Officers Richardson's and McMillen's actions because it failed to "employ qualified persons for positions of authority," "properly or conscientiously train and supervise the conduct of such persons after their employment," and "promulgate appropriate operating policies and procedures" to protect Blough's constitutional rights. [DE 35 at 222]. To state a claim against a city or a county under § 1983, "a plaintiff must show that his injury was caused by an unconstitutional 'policy' or 'custom' of the municipality." *Stemler*, 126 F.3d at 865 (citing *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658 (1978)); *see also City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989).

With no underlying constitutional violation, Plaintiffs cannot succeed on claims for supervisory or municipal liability. *McQueen v. Beecher Cmty. Schs.*, 433 F.3d 460, 471 (6th Cir.

2006).  Further, Plaintiffs clarified at the October 30, 2018 hearing that they do not intend to pursue a *Monell* claim.  [DE 76, Oct. 30, 2018 Tr., 4023:17–22].  Plaintiffs' *Monell* claim is thus moot.

## C.     State-Law Claims

### 1.  General Negligence, Negligent Infliction of Emotional Distress, and Wrongful Death

Plaintiffs bring three related state-law negligence claims.  First, Plaintiffs claim that Officers Richardson and McMillen were negligent in their treatment of Blough.  [DE 35 at 222–23].  Second, Plaintiffs claim that Defendants' actions constitute negligent infliction of emotional distress for Reich.  [*Id.* at 225].  Finally, Plaintiffs allege that because of Defendants' negligence, Blough's estate is entitled to wrongful death damages under Ky Rev. Stat. Ann. § 411.130.  *Id.*

Defendants respond that they are entitled qualified official immunity under Kentucky law.  [DE 55 at 538].  "Qualified official immunity applies to the negligent performance by a public officer or employee of (1) discretionary acts or functions, *i.e.*, those involving the exercise of discretion and judgment, or personal deliberation, decision, and judgment; (2) in good faith; and (3) within the scope of the employee's authority."  *Yanero v. Davis*, 65 S.W.3d 510, 521–22 (Ky. 2001).  But "an officer or employee is afforded no immunity from tort liability for the negligent performance of a ministerial act, *i.e.*, one that requires only obedience to the orders of others, or when the officer's duty is absolute, certain, and imperative, involving merely execution of a specific act arising from fixed and designated facts."  *Id.* at 522.  Thus, qualified immunity depends "on the function performed" and whether the official acted in "good faith."  *Id.* at 521.

In this case, Officers Richardson's and McMillen's actions were clearly discretionary.  *See Nichols v. Bourbon Cty. Sheriff's Dep't*, 26 F. Supp. 3d 634, 642 (E.D. Ky. 2014) (holding that determination of the amount of force required to effect an arrest is a discretionary act within the scope of an officer's authority); *Woosley v. City of Paris*, 591 F. Supp. 2d 913, 922 (E.D. Ky.

2008) (holding that a police officer's use of force is clearly a discretionary act within the scope of his authority as a police officer); *see also Lamb v. Holmes*, 162 S.W.3d 902, 908 (Ky. 2005) (finding that school officials' search of students was discretionary because there was no policy directly on point and the breadth of the search required judgment within the scope of the officials' duties). As a result, "the burden shifts to the Plaintiff 'to establish by direct or circumstantial evidence that the discretionary act was not performed in good faith.'" *Nichols*, 26 F. Supp. 3d at 642 (quoting *Yanero*, 65 S.W.3d at 523).

In *Yanero*, the Kentucky Supreme Court adopted the United States Supreme Court's definition of "bad faith," which has "both an objective and subjective aspect":

> The objective element involves a presumptive knowledge of and respect for "basic, unquestioned constitutional rights." *Wood v. Strickland*, 420 U.S. 308, 322 (1975). The subjective component refers to "permissible intentions." *Id.* Characteristically, the Court has defined these elements by identifying the circumstances in which qualified immunity would not be available. Referring both to the objective and subjective elements, we have held that qualified immunity would be defeated if an official "knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff], or if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury…"

*Yanero*, 65 S.W.3d at 523 (citing *Harlow*, 457 U.S. at 815). "Thus, in the context of qualified official immunity, 'bad faith' can be predicated on a violation of a constitutional, statutory, or other clearly established right which a person in the public employee's position presumptively would have known was afforded to a person in the plaintiff's position, *i.e.*, objective unreasonableness; or if the officer or employee willfully or maliciously intended to harm the plaintiff or acted with a corrupt motive." *Id.* Put simply, "[i]f an officer 'knew or reasonably should have known that the action he took would violate a [clearly established] right of the

plaintiff,' bad faith may be found to exist." *Rowan Cty. v. Sloas*, 201 S.W.3d 469, 485–86 (Ky. 2006) (quoting *Yanero*, 65 S.W.3d at 523).

Here, the Court has already determined that Officers Richardson and McMillen behaved objectively reasonable under the circumstances when seizing Blough and did not violate a clearly established right. There are thus no grounds to find that the officers "willfully or maliciously intended to harm the plaintiff," "acted with a corrupt motive," or otherwise acted in bad faith. For these reasons, Defendants are entitled to qualified official immunity under Kentucky law, and Plaintiffs' negligence claims fails.

Plaintiffs' wrongful death claim fails for similar reasons. Under Kentucky law, if the death of a person results from injury inflicted because of another's negligence, the deceased's estate may recover damages. Ky Rev. Stat. Ann. § 411.130. "A wrongful-death claim 'is, at its core, a tort claim based upon negligence.'" *Gambrel v. Knox Cty., Kentucky*, No. CV 17-184-DLB, 2018 WL 1457296, at *13 (E.D. Ky. Mar. 23, 2018) (quoting *Patton v. Bickford*, 529 S.W.3d 717, 729 (Ky. 2016)). Having found no evidence of negligence and determined that Defendants are thereby protected by qualified official immunity, Plaintiffs are not entitled to wrongful-death damages. *See Whitlow*, 39 F. App'x at 308.

## 2. Negligent Hiring, Training, and Supervision

Similarly, Plaintiffs allege that Chief Schiller failed to adequately hire, train, and supervise Officers Richardson and McMillen. [DE 35 at 223]. As previously noted, The Court granted an Agreed Order of Partial Dismissal on all claims pertaining to Chief Schiller on August 18, 2017 [DE 38]. Plaintiffs do not allege that any of the other defendants failed to adequately hire, train, and supervise Officers Richardson and McMillen, so this claim is dismissed in its entirety.[5]

---

[5] Plaintiffs' claim would fail even if they did allege that other defendants failed to adequately hire, train, and supervise. "If a person has suffered no constitutional injury at the hands of the individual police officer,

### 3. Common Law Battery

Plaintiffs also allege that Officers Richardson and McMillen committed common law battery upon Blough. [DE 35 at 223–24]. A battery is "any unlawful touching of the person of another, either by the aggressor himself, or by any substance set in motion by him." *Richardson v. Bd. of Educ. of Jefferson Cty. Kentucky*, No. 3:04-CV-386R, 2006 WL 2726777, at *11 (W.D. Ky. Sept. 22, 2006) (citing *Vitale v. Henchey*, 24 S.W.3d 651, 657 (Ky. 2000)). If police action is reasonable under Section 1983, a plaintiff cannot succeed on a common law battery claim. *Atwell v. Hart Cty., Ky.*, 122 F. App'x 215, 219 (6th Cir. 2005) (citing *Fultz v. Whittaker*, 261 F. Supp. 2d 767, 783 (W.D. Ky. 2003)). This Court has already determined that Officers Richardson and McMillen acted reasonably under the circumstances when seizing Blough. For those same reasons, the battery claim must be dismissed.

### 4. Outrage and Intentional Infliction of Emotional Distress

Finally, Plaintiffs claim that "Defendants' treatment of Mr. Blough and Ms. Reich was so beyond the bounds of human decency that it exemplifies the tort of outrage." [DE 35 at 224]. Plaintiffs separately allege intentional infliction of emotional distress upon Reich. *Id.* at 224–25. Courts generally treat claims of outrage and intentional infliction of emotional distress interchangeably. *Powell v. Cornett*, No. 3:11-CV-00628-H, 2013 WL 1703746, at *1 (W.D. Ky. Apr. 19, 2013) (citing *Atwell*, 122 F. App'x at 219). Under Kentucky law, outrage and intentional infliction of emotional distress are premised upon extreme and outrageous conduct intentionally

---

the fact that the departmental regulations might have *authorized* the use of constitutionally excessive force is quite beside the point." *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986). *See also Whitlow*, 39 F. App'x at 302 ("[I]f Whitlow suffered no constitutional violation, then Plaintiff's claims against Louisville and Hamilton alleging that their lack of training and failure to supervise the individual officers resulted in Decedent's death, must fail. In other words, Plaintiff's claims against the city are dependent upon the existence of a constitutional violation by its officers."); *Scott v. Clay Cnty., Tenn.*, 205 F.3d 867, 879 (6th Cir. 2000) ("[O]ur conclusion that no officer-defendant had deprived the plaintiff of any constitutional right a fortiori defeats the claim against the County as well.").

or recklessly causing emotional distress. *Atwell*, 122 F. App'x at 219 (citing *Craft v. Rice*, 671 S.W.2d 247, 251 (Ky. 1984)). A plaintiff must prove that a defendant's sole intent was to cause extreme emotional distress to the plaintiff. *Rigazio v. Archdiocese of Louisville*, 853 S.W.2d 295 (Ky. App. 1993) (holding that boys sexually abused by priests had no claim for outrage because the priests molested them to satisfy their own sexual appetites, not to inflict harm on the boys).

In analyzing the claims brought under § 1983, the Court has already concluded that the actions taken by Officers Richardson and McMillen were objectively reasonable in light of Blough's noncompliance and belligerence. Accordingly, his state-law claims for outrage and intentional infliction of emotional distress must similarly be dismissed.

## CONCLUSION

For the reasons set forth above, and being otherwise sufficiently advised, **THE COURT HEREBY ORDERS** that Defendants' Motion for Summary Judgment [DE 55] is **GRANTED**. This is a final and appealable order.